IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

EARNEST M. WRIGHT,                    )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        CASE NO. 2:10-cv-00841-RAH
                                      )                **WO**
                                      )
STATE OF ALABAMA, DEPARTMENT          )
OF CORRECTIONS, et al.,               )
                                      )
        Defendants.                   )

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

This matter arises from either a lapse in pivotal security procedures by an officer with a checkered professional history—or inimical discrimination and retaliation against a well-meaning guard—at one of this state's carceral institutions.

Earnest M. Wright (Wright or Plaintiff) is an African-American correctional officer stationed at the Donaldson Correctional Facility (Donaldson), formerly known as West Jefferson Correctional Facility (WJCF), a maximum-security prison facility operated by the Alabama Department of Corrections (ADOC) near Bessemer, Alabama. The ADOC terminated Wright from his position in February 1994 but re-hired him in March 2007. This lawsuit concerns his 1994 termination, which Wright claims was discriminatory based upon his race and in retaliation for

1

his filing of a charge of discrimination (Charge) with the United States Equal Employment Opportunity Commission (EEOC) in 1992, in violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981 and § 1983.  Aside from the ADOC, Wright also sues the current Commissioner of the ADOC, Jefferson S. Dunn (Dunn), and both the Alabama State Personnel Department (ASPD) and its present Director, Jackie B. Graham (Graham) (collectively, Defendants).

Pending before the Court are the Defendants' motions for summary judgment (Motions).  (Docs. 31, 36.)   These Motions are supported by extensive briefs and documentary materials, (Docs. 32, 37), as corrected (Docs. 43, 47).  Wright has responded with a motion as well as additional evidentiary submissions, (Docs. 44-45), to which Defendants have now replied, (Docs. 52-53).

Having carefully reviewed these materials, for the reasons more fully set forth below, this Court concludes that the Defendants' motions are due to be granted.

## II.   <u>JURISDICTION</u>

This Court has original subject matter jurisdiction pursuant to 42 U.S.C. §1331 and § 1343 and statutory jurisdictional under 42 U.S.C. § 2000e-5.[1]  While the parties do not challenge venue, the Court independently concludes that venue properly lies in the Middle District of Alabama.  28 U.S.C. § 1391.

---

[1] In this opinion, any and all references to "Section []" or "§ []" are to parts of this title of the United States Code (Code).

III.   **FACTS AND PROCEDURAL HISTORY**

A.   **Wright's Performance: Pre-November 11, 1993**

Wright initially was hired by the ADOC as a Correctional Officer Trainee on April 7, 1986.  (Doc. 32-1.)  ADOC assigned him to WJCF on May 14, 1986.  (Doc. 32 at 1.)  After completing a probational term, he received an automatic promotion to a Correctional Officer I on June 20, 1987.  (Doc. 32-3.)  He subsequently received "periodic raises" but no promotion during his first stint at WJCF (Doc. 44 at 1).[2]

The genesis of the parties' instant conflict took place in the fall of 1992.  On September 17, 1992, via letter, ADOC informed Wright of his selection for termination "as part of a layoff" compelled by a funding shortfall.  (Doc. 44 at 1-2; *see also* Doc. 45-1 at 15; Doc. 45-10 at 2-3.)  "[I]n no way discreditable" to Wright, this missive listed his date of termination as October 2, 1992.  (Doc. 45-1 at 15; Doc. 45-10 at 2.)  On November 2, 1992, Wright filed the Charge in direct response to this specific notification.  (Doc. 45-1 at 18; *see also* Doc. 44 at 1-2, Doc. 45-10 at 5.)  While the Charge alleged a parade of Alabama state officials had discriminated against Wright "because of . . . [his] Race, Black, in all terms and conditions of employment," it characterized his termination as discriminatory for one reason:

---

[2] Wright returned to Donaldson as a correctional officer on June 18, 2007. (Doc. 32-9; *see also* Doc. 32-11.)

"[T]here are whites with less seniority than me who are not being terminated." (Doc. 45-1 at 18; Doc. 45-10 at 5.)  ADOC received notice of this action on November 10, 1992.  (Doc. 44 at 2.)  Ultimately, no layoffs took place because the state legislature increased funding to the ADOC.  (Doc. 45-6 at 11; *see also* Doc. 44 at 2; Doc. 45-1 at 21; Doc. 45-10 at 2-3, 12, 14.)

On January 25, 1993, Wright received a letter of reprimand from the warden, John E. Nagle (Nagle), at WJCF.  (Doc. 45-1 at 3; Doc. 45-10 at 17.)  Wright's alleged use of profanity in supervising and directing inmates on January 15, 1993, prompted this rebuke (Doc. 45-1 at 3; Doc. 45-10 at), as purportedly observed by two of his colleagues (Doc. 45-1 at 3).  According to Wright, Nagle as well as these two men were "white."  (Doc. 45-1 at 3.)  Wright disputed this accusation, though he acknowledged some "incident" took place.  (*Id.* at 3-4.)  Still, Wright took no further action because, by his own admission, he received no suspension or loss of pay.  (*Id.* at 4-5.)

Even prior to this reprimand, Wright had been disciplined more than once by his WJCF superiors.  (Doc. 32-4 at 1-2.)  He received a ten-day suspension without pay "relating to sleeping while on duty" on July 11, 1987.  (*Id.* at 2.)  He was placed on restrictive sick leave due to "setting [a] pattern of abuse" on December 17, 1987, and not removed due to improvement in his usage until July 25, 1989.  (*Id.*)  On August 23, 1989, less than a month later, he was returned to restrictive sick leave.

4

(*Id.*)  He received an oral reprimand relating to this use of sick leave on October 12, 1989, and one relating to tardiness on November 16, 1989.  (*Id.*)  A fifteen-day suspension for inattentiveness while on duty followed on January 6, 1990, and an oral reprimand relating to his failure to call back on sick leave was issued on February 2, 1990.  (*Id.*)  He also received leave for one hour without pay for being late "due to rides car breaking down" on November 9, 1990.  (*Id.*)  Then, there were two more incidents of unspecified misconduct that complete his pre-January 25, 1993, file.  (*Id.*)

As to this record, Wright has merely acknowledged "that they're on paper." (Doc. 45-6 at 24.)

### B.    Night of November 11, 1993

On the night of November 11, 1993, Wright was one of six correctional officers working the six observation towers at WJCF during the third shift, which lasted from 10:00 p.m. – 6:00 a.m.  (Doc. 45-1 at 6; *see also* Doc. 32-4.)  Three white officers—Jimmy Weeks (Weeks), Peter Blair (Blair) and Ralph Keef (Keef)—manned Towers 1, 2 and 4, respectively.  (Doc. 45-1 at 6; Doc. 45-3 at 17-18.) Wright, Ricky Grider (Grider), and Clarence Burch (Burch), three African American officers, were stationed in Towers 3, 5 and 6, respectively.  (Doc. 32-7 at 3; Doc. 45-1 at 6; Doc. 45-3 at 17-18.)

The prison's Standard Operating Procedures (SOP) apparently did specify the duties of such officers.  (*E.g.*, Doc. 45-3 at 15-16; Doc. 45-1 at 23-24.)  Per these regulations, each of the six men on duty, including Wright, was "responsible for the security of all fences, roof tops and areas around their assigned tower and in their field of view."  (Doc. 45-1 at 23.)  At all times, a tower officer was to "remain alert to any vehicle entering or departing the facility," as well as "[a]ny vehicle attempting to go around the perimeter road . . . ."  (*Id.* at 24.)  Relevant here, the SOP expressly states: "Any time a sergeant or above or any Dog Handler comes by or stops at a tower the *tower officer* will acknowledge the presence of these individuals."  (*Id.* (emphasis added).)  During daylight, clearly showing oneself "to the person in the vehicle" and waving was sufficient.  (*Id.*)  At night, however, "the acknowledgement" was supposed to be done "by the tower officer *flashing the inside tower lights on and off at least twice*."  (*Id.* (emphasis added).).  As the SOP warns, "[d]uring the hours of darkness, increased vigilance is a must."  (*Id.*)  Though Wright denies this policy's reality, he does at one point concede the existence of some kind of regulation.  (Doc. 45-7 at 19-21.)

At approximately 12:15 a.m. on November 12, 1993, an assistant dog handler, Sergeant Harry Dean Findley (Findley), approached the perimeter of the facility to retrieve a wood ramp.  (Doc. 45-1 at 6; Doc. 32-4.)  Beginning in Tower 2, Findley informed Blair that he was going to perform a perimeter check after retrieval of the

ramp. (Doc. 32-7 at 4; Doc. 45-1 at 6, 19.)  Generally, during such a perimeter check, an officer would drive around the perimeter of the prison, being acknowledged by one or more officers in each of WJCF's six towers. (Doc. 45-3 at 16-17).  Though the SOP refers to "the tower lights" (Doc. 45-1 at 24), the tower officers were expected to promptly provide such recognition via some form of visible light, (Doc. 45-3 at 16-17, 19-20).  Though less than unambiguously, Wright has denied the existence of even such an informal policy.  (Doc. 45-1 at 5.)

After his colloquy with Blair, Findley launched and completed his first inspection.  He passed Grider in Tower 5 and Burch in Tower 6; neither immediately acknowledged him in the required manner, though both eventually did so.  (Doc. 45-3 at 18; *see also* Doc. 32 at 1-2.)  In contrast, Weeks and Keef never did so.  (Doc. 45-3 at 18; *see also* Doc. 32 at 1-2.)  Upon completing his check, Findley returned to his residence and called his shift commander to report the events of the evening. (Doc. 45-3 at 18-19.)

Concerned by several tower officers' lack of response, Findley returned to WJCF at approximately 2:10 a.m. on his own initiative and drove the perimeter road again.  (Doc. 32-4 at 1; Doc. 45-3 at 20.)  During this second sweep, Blair in Tower 2 acknowledged Findley, as did Keef in Tower 4. (Doc. 45-3 at 20-21.)  Wright in Tower 3, Grider in Tower 5, and Burch in Tower 6 failed to do so.  (*Id.*)

7

With his second sweep completed, Findley went home and returned to WJCF with a video camera in hand.  (Doc. 45-3 at 21-22.)  Armed with this device, Findley approached the perimeter again. This time, officers in Towers 1, 2, 4, 5 and 6 immediately acknowledged him.  (*Id.* at 23.)  According to Findley, for the third time that night, however, Wright purportedly neglected to respond with alacrity. (*Id.*)  He only did so once Findley stopped his vehicle and got out.  (Doc. 32-4 at 1; Doc. 45-3 at 23.)

Although Wright broadly disputes Findley's account of the night of November 11 and the morning of November 12 (Doc. 45-1 at 7), he has also made several telling admissions as to the foregoing trips.  As to Findley's first trip, he has testified: "I don't recall flicking my lights."  (Doc. 45-6 at 24.)  He later admits that Findley *possibly* had to flash his lights on several occasions before he responded and acknowledged him during the former's second trip by walking onto the catwalk. (Doc. 45-7 at 18-19.)  When Findley came a third time, an "upset" Wright claims to have "walk[ed] out and ask[ed] him what was going on" due to his "bizarre behavior."  (Doc. 45-6 at 24.)

For the fourth time, Findley then made one more trip around the perimeter, during which all tower officers promptly acknowledged him.  (Doc. 45-3 at 32.) Returning home, Findley communicated the results of his last three perimeter checks to his shift commander.  (*Id.* at 40.)

As all parties agree, Findley had no more involvement in this suit's precipitating events. He had no role in recommending how and whether the tower officers would be disciplined. (*Id.* at 40-41.) Findley also had no knowledge that Wright had filed an EEOC charge months earlier. (*Id.* at 36.)

## C. Aftereffects: Notice of Intent to Recommend Dismissal and Internal Appeal

On December 1, 1993, ADOC gave Wright notice of its intent to terminate him for failing to acknowledge Findley. (Doc. 32-4.) Wright was not the only officer to receive such news, as Grider received one as well. Report and Recommendation, *Rickey Grider v. State of Alabama*, Case No. 2:06-cv-992-MHT (M.D. Ala. July 11, 2007), ECF No. 34 [hereinafter *Grider* Case].[3] Wright's Notice of Intent to Recommend Dismissal (Notice) read as follows:

> You were assigned to work Tower 3 on November 11, 1993 on third-shift (10:00 p.m. – 6:00 a.m.). During your shift, you failed to acknowledge the presence of the Assistant Dog Handler, Harry Findley on the perimeter road or to acknowledge his presence at Tower 3. This happened twice during your shift.
>
> ...
>
> Your actions constitute a violation of the following portions of the Department of Corrections Administrative Regulation 207, "Standards of Conduct, Department of Corrections Employees." . . . .

---

[3] This Court may take judicial notice of any such records, especially when, as here, the parties attach them to their briefing.

1.  Section III-1/B-"Render full, efficient, and industrious service.

2.  Section III-2.-"Each employee's conduct shall, at all times, be consistent with the maintenance of proper security and welfare of the institution and of the prisoners under his or her supervision. . . .

Considering this recent incident, along with your repeated previous infractions, I have no recourse but to recommend your dismissal from employment with this institution and the Department of Corrections.  . . .

(Doc. 32-4.)  Wright refused to sign for the Notice's receipt.  (*Id.* at 3.)

As the Notice clearly states, in deciding to terminate Wright, Warden Nagle considered Wright's prior disciplinary history.  That documented past featured seven previous infractions, including one ten-day suspension for sleeping while on duty and one fifteen-day suspension for inattentiveness while on duty.  (Doc. 32-4 at 2; 32-5.)  Crucially, these two prior infractions evidenced Wright's inattentiveness. According to the ADOC, the November 12 events therefore constituted Wright's "third-strike" for this particular impropriety.  (Doc. 53 at 10.)

The Notice's delivery triggered the ADOC's internal administrative process. (Doc. 32-4 at 3.) Nagle and Wright first participated in a pre-dismissal conference at which Wright's work history was reviewed.  (Doc. 32-4 at 3.)  After considering the Notice, associated documents, Wright's overall record, and the defense he had offered during this conference, (Doc. 32-4 at 3), the then-Commissioner of the

ADOC, Tommy Herring (Herring), adopted Nagle's recommendation and ordered Wright's termination.  (Doc. 32-5.)  Wright's first stint with ADOC thusly ended, effective February 18, 1994.[4] (*Id.* at 2.)

### D.    Aftereffects: External Appeal

Wright then appealed his termination to the Alabama State Personnel Board. (Doc. 32-6; Doc. 32-7.)

In accordance with its regulations, the ASPB appointed a hearing officer to make proposed findings of fact and conclusions of law.  (Doc. 32-8.)  The Honorable Daniel T. Hull Jr. (Hull) held a prehearing conference at WJCF on April 11, 1994, and the hearing itself on June 9, 1994.  (Doc. 32-7 at 1-2.)  Among other things, Hull weighed testimony from four persons—Wright, Blair, Findley, and Grant Dewayne Culliver, Wright's supervisor as of November 1993—and considered several documents: map of the six towers' location; SOP; four reports as to the November 11, 1993, incident; and at least two more unidentified papers.  (*Id.* at 2-8.)  In his report, Hull made four findings of fact—that (1) Wright had been inattentive on two occasions on November 11 and 12, 1993; (2) alertness and attentiveness at all times by the assigned tower guard is "important to the [prison's] security"; (3) all three

---

[4] In the interim, on February 24, 1994, Wright filed a second charge of discrimination with the EEOC claiming discrimination by the ADOC in his termination.  (Doc. 45-1 at 39; Doc. 45-11 at 24.) Wright amended his charge on April 28, 1994, to include a claim of retaliation.  (Docs. 45-1 at 42; Doc. 45-11 at 48.)

officers who evidenced their inattentiveness at that time received the same discipline; and (4) the officers not disciplined evidenced no inattentiveness. (*Id.* at 2.) Hull also concluded that (a) Wright was not terminated due to the SOP's selective enforcement, and (b) Wright had not been prejudiced by the ADOC's failure to provide timely witness and exhibit lists.  (*Id.*) Simply put, Hull rejected Wright's assertion that ADOC had selectively enforced its acknowledgement policy against the African-American tower officers.  (*Id.*) He therefore recommended that the ASPB affirm the ADOC's decision to terminate Wright.  (*Id.* at 8.)

The ASPB thereupon conducted its review as to whether Wright had been "inattentive twice while assigned to duty on Tower 3."  (Doc. 32-8.) It not only weighed Hull's report but also held oral argument.  (*Id.* at 1.)  Finding no evidence of mitigation of punishment, the ASPB ultimately so decided.  (*Id.* at 1-2.)

### E.    Post-ASPB Events

After Wright's termination, another African-American officer filled his position.  (Doc. 36-5 at 3.) It remains so today.  (*Id.*)

Similarly terminated because of the events of November 12, 1993, Grider filed suit claiming discrimination in connection with his termination.  The *Grider* Case ultimately was dismissed at the summary judgment stage.

12

Wright's litigation history against the ADOC began in May 1993 when he intervened in the statewide employment discrimination action entitled *Crum, et al. v. State of Alabama, et al.,* Case No. 2:94cv356-MHT (M.D. Ala.). On October 6, 2010, the district court granted Wright's motion to convert his intervenor class claims into an individual action premised primarily upon his 1994 termination.  (Doc. 1.) That decision resulted in the filing of the instant case.  (*Id.*)

## IV.   <u>LEGAL STANDARD</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure,[5] summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  The movant may meet this burden

---

[5] In this opinion, any and all reference to "Rule []" or "Rules []" are to one or more provisions of this procedural compendium.

by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24. If the movant succeeds, the non-movant must now establish, with evidence beyond the pleadings, that a genuine issue material to its case exists. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993); *see also id.* at 1116, n. 3 (discussing Rule 56(e)) ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response . . . must set forth specific facts showing that there is a genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997); *Harris*

*v. Ostrout*, 65 F.3d 912, 916-18 (11th Cir. 1995).  Similarly, "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion." *Anderson*, 477 U.S. at 256-57 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984)).  However, if there is a conflict in the evidence, "the [plaintiff's] evidence is to be believed and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000); *U.S. v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal quotation marks and citations omitted).

After the nonmoving party has responded, a district court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).

## V.   DISCUSSION

### A.   Wright's Race Discrimination Claims – *McDonnell Douglas*

Wright contends that he was wrongfully terminated in 1994 from his position as a correctional officer because of his race.  Specifically, he alleges that, although he and the other African-American tower officers were fired for allegedly failing to acknowledge Findley in accordance with ADOC policy, the three white tower officers also on duty that night were not fired.  Wright sues under Title VII and § 1981.

Title VII and § 1981 both prohibit race-based discrimination.  42 U.S.C. § 2000e-2(a)(1); *Walker v. NationsBank of Fla.*, 53 F.3d 1548, 1555 (11th Cir. 1995). Moreover, the elements of race-based employment discrimination claims brought under either are the same.  *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Accordingly, the Eleventh Circuit "has routinely and systematically grouped Title VII and § 1981 claims for analytic purposes."  *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010).  The Court will do the same.

To defeat that part of the Motions that challenge Wright's ability to make out a prima facie case of discrimination, Wright first must make such a showing by one of three generally accepted methods: (1) presenting direct evidence of discriminatory intent; (2) presenting evidence to satisfy the four-part circumstantial evidence test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or (3) presenting statistical proof.  *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). Where, as here, Wright relies on the second method, i.e. circumstantial evidence, to establish discriminatory intent, the Court uses the *McDonnell Douglas* analytical framework to evaluate the sufficiency of Wright's evidence.  *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1335-36 (11th Cir. 2015). Under this burden-shifting framework, "a plaintiff first must make out a prima facie case of discrimination that 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'"  *Flowers*, 803 F.3d at 1336 (quoting *Tex. Dep't of Cmty. Affairs v.*

16

*Burdine*, 450 U.S. 248, 254 (1981)). If a plaintiff presents a prima facie case, then the burden shifts to a defendant to articulate a non-discriminatory basis for the employment action at issue. If the latter carries this light burden, then the burden returns to the plaintiff to prove that the defendant's stated reason is pretext for intentional discrimination. *Flowers*, 803 F.3d at 1336.

To satisfy the first part of the *McDonnell Douglas* framework, Wright must show that (1) he is a member of a protected class; (2) he was qualified for his job; (3) he was subjected to an adverse employment action; and (4) his employer treated similarly situated employees outside his class more favorably. *Curtis v. Broward Cnty.*, 292 F. App'x 882, 883 (11th Cir. 2008) (citing *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003)).[6] Alternatively, Wright may establish the fourth element of his prima facie case by presenting evidence that he was replaced by someone outside his protected class. *Hudson v. Middle Flint Behavioral Healthcare*, 522 F. App'x 594, 596 (11th Cir. 2013).

Wright's first alleged proof of racial discrimination—that he was wrongly reprimanded for the use of profanity when a number of other correctional officers were not disciplined for similar conduct—fails as a matter of law. (Doc. 44, p. 21.)

---

[6] Although unpublished opinions, generally denominated by a cite to the Federal Appendix or some electronic medium, "are not considered binding precedent . . . , they may be cited as persuasive authority." 11th Cir. R. 36-1. The Court treats them as such here and elsewhere.

Typically, the "reprimand of an employee does not constitute an adverse employment action when the employee suffers no tangible harm as a result." *Summerlin v. M & H Valve Co.*, 167 F. App'x 93, 97 (11th Cir. 2006) (per curiam) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001); and *Akins v. Fulton Cty., Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005)). Here, Wright does not allege that the written reprimand affected any important condition of his employment, such as salary, benefits, title, or job duties. He actually says nothing at all, much less provide more than a scintilla of concrete evidence, that any tangible consequences followed. Due to this incontrovertible lapse, the Court concludes the written reprimand had no adverse effect on Wright's employment, entitling the Defendants to summary judgment concerning any discrimination claim based on this 1993 reprimand. *See Atkins*, 420 F.3d at 1301 (concluding that because plaintiff had not alleged that the reprimand affected the terms and conditions of employment, the reprimand did not constitute an adverse employment action).

Wright's termination, however, does constitute an adverse employment action that merits consideration. As to this act, the ADOC argues that Wright cannot meet his prima facie burden for two reasons: first, his position was filled by another African-American officer, and second, Wright has not presented any similarly

18

situated white comparators.  Since Wright does not contest the former, the pertinent inquiry concerns whether Wright has tendered proper comparators.

The Eleventh Circuit recently addressed the comparator analysis in *Lewis v. City of Union City, Georgia.*  918 F.3d 1213 (11th Cir. 2019).  In *Lewis*, the Circuit clarified that a plaintiff proceeding under the *McDonnell Douglas* framework must show that his alleged comparators are "similarly situated in all material respects." *Id*. at 1218.  Although what constitutes a "material" similarity or difference will differ from case to case, a similarly situated comparator generally will have "engaged in the same basic conduct (or misconduct) as the plaintiff"; "been subject to the same employment policy, guideline, or rule as the plaintiff"; "been under the jurisdiction of the same supervisor as the plaintiff"; and "share[d] the plaintiff's employment or disciplinary history."  *Id.* at 1227-28.

Here, Wright has pointed to only three individuals as comparators.  Two individuals (Blair and Keef) were white tower officers on duty the night of November 12, 1993, who were not ultimately terminated.  The third comparator (Brumley) is a third white correctional officer disciplined for being inattentive on multiple occasions but never fired.

The ADOC contests each person's suitability.  It first argues that Blair is not an adequate comparator because Blair was not accused of being inattentive by Findley on the night in question.  Furthermore, even if he had been observed as being

19

inattentive, he still would not have been a proper comparator due to a disciplinary history much less extensive than Wright's history.

The ADOC next contends that Keef is not a proper comparator for two reasons. First, there is no evidence that Keef failed to acknowledge Findley on November 12, 1993; second, Keef's disciplinary history consisted of only one previous suspension almost ten years earlier. (Doc. 32 at 7; Doc. 53 at 9.) Although the testimony of Findley is consistent with this position, (*see* Doc. 45-3 at 16-28), the ADOC in its evidentiary submission in support of its summary judgment motion submitted an affidavit from Nagle in which Nagle testified differently; that is, that Keef, in fact, had been inattentive on November 12, 1993. (Doc. 36-2 at 3.) Since the Court must construe the facts in the light most favorable to Wright, the Court will consider Keef in a manner that assumes Keef failed to acknowledge Findley on November 12, 1993.

Finally, as to Brumley, Wright argues that he is a proper comparator because Brumley had an extensive disciplinary history, including multiple instances of being inattentive, but he was never terminated. ADOC, as it does with Blair and Keef, argues that Brumley was not accused of the same misconduct as Wright, did not have the materially same disciplinary history as Wright, and was not in a third-strike situation, as Wright on November 12, 1993.

After careful review, the Court concludes that Blair, Keef, and Brumley are not proper comparators because none of them are similarly situated in "all material respects" to Wright.

As it concerns Blair and Keef—the two white comparators who were on tower duty the night of November 12, 1993—neither individual had materially the same or similar disciplinary history as Wright.  Unlike Wright, who had been disciplined seven times prior to his termination, including two suspensions (inattentiveness while on duty and sleeping while on duty) and four reprimands, and who was documented to have been repeatedly inattentive by Findley, Blair had been disciplined on only three occasions.  Not one of those events had netted a suspension, and no oral or written reprimands had followed a single one.  Perhaps most importantly, Findley did not document Blair's inattentiveness. (Doc. 32-17 at 2.) Keef had an even less packed disciplinary history than Blair: one prior infraction, punished by a ten-day suspension, from 1984, nearly ten years before the night in question. (*Id.*)  Further, Blair and Keef had never been found inattentive or asleep even once, while Wright had been twice so found, before the night of November 12, 1993.

Consequently, the Court concludes that Wright's November 12, 1993 inattentiveness infraction, which Blair did not commit but Keef did,[7] Wright's two prior inattentive and sleeping offenses, Wright's two prior suspensions, and Wright's more extensive disciplinary history are sufficient to establish that Wright was not similarly situated in all material aspects to Blair and Keef. *See Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (multiple arrests sufficient to establish plaintiff not similarly situated to comparator); *Maniccia v. Brown,* 171 F.3d 1364, 1369 (11th Cir. 1999) (female plaintiff not similarly situated to male comparators where female plaintiff had committed at least four policy violations while male comparators had each only committed one policy violation); *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1312 (11th Cir. 1998) (female plaintiff who committed multiple acts of misconduct in a single day not similarly situated to other employees who had each only committed one act of misconduct). Thus, these two men are not proper comparators.

Wright's third comparator is Brumley. A white correctional officer, Brumley had committed more than eleven infractions over an eleven-year period, including four instances in which Brumley was observed to be inattentive or asleep at his post. Two of these incidents occurred when Brumley was manning a perimeter tower.

---

[7] As Wright does not contend that Weeks, who also was present on November 12, 1993, is a proper comparator, the Court need not analyze him.

Despite this history, unlike Wright, Brumley was never terminated for his inattentiveness, even when he was so classified for a third and fourth time.

With that said, the Court nonetheless concludes that Brumley too is not a proper comparator for two reasons. True, he did have more disciplinary infractions and suspensions than Wright over his entire ADOC work history. But Brumley's disciplinary history occurred over an eleven-year period, compared to Wright's five-year history. Also, three of the four occasions in which Brumley was cited for being inattentive not only occurred almost ten years after Wright's termination but were also adjudged by a different warden and commissioner. (Doc. 45-10 at 51-53; Doc. 45-15 at 28-62.)

As to the latter point, the Eleventh Circuit has explicitly noted that differences in treatment by different supervisors or decisionmakers, although not dispositive, can seldom be the basis for a viable discrimination claim. *Horn v. United Parcel Serv., Inc.*, 433 F. App'x 788, 793 (11th Cir. 2011) ("[I]t is relevant, but not dispositive, that different decisionmakers were involved in administering discipline.").

Here, the Court concludes that the combination of different decisionmakers—Wright's warden was Nagle, and his ADOC director was Tommy Herring, while Brumley's warden was Stephen Bullard, and his ADOC directors were Michael Haley and Donal Campbell—and the temporal distance (ten years) between the night

23

in question and three of Brumley's inattentiveness infractions render Brumley's incidences of inattentiveness simply far too remote to transform him into a proper comparator for Title VII purposes.  The difference in kind and degree is just too great.

Consequently, Wright has come forward with no similarly situated comparators for purposes of establishing his prima face case, and the ADOC is entitled to summary judgment with respect to Wright's discrimination claims.[8] *See Holifield*, 115 F. 3d at 1562.

The ADOC's alternative argument for relief merits its own analysis.  Even if Wright made out a prima facie case of discrimination, the ADOC contends that Wright's claim still would fail because he is unable to show that the DOC's reason for terminating him was pretext for an underlying discriminatory motive.  As the record shows, Wright was terminated for being inattentive for a third time after a long history of disciplinary problems over a relatively short tenure of five years. (Doc. 53 at 8, 11.) That third time, it stresses, constitutes an egregious circumstance because it occurred at a perimeter tower of a maximum-security prison.  (*Id.*)

---

[8] ADOC also argues that Wright's discrimination and retaliation claims are barred because the ADOC successfully raised the *Ellerth-Faragher* affirmative defense, as established in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Because Wright failed to establish his claims for discrimination and retaliation, the Court need not determine whether the *Ellerth-Faragher* defense applies to the facts of this case.

Based on the observations of Findley and Wright's disciplinary history, the Court concludes that the Defendants have proffered a legitimate, non-discriminatory reason for terminating Wright's employment. *See Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 770 (11th Cir. 2005) (noting that "[s]o long as the employer articulates a clear and reasonably specific non-discriminatory basis for its actions, it has discharged its burden of production") (internal quotation marks omitted).

Because the ADOC has satisfied its burden to proffer a legitimate, non-discriminatory reason for terminating Wright, the burden now shifts to Wright to establish that the ADOC's reason is merely pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Alexander v. Fulton Cty., Ga.,* 207 F.3d 1303, 1336 (11th Cir. 2000)[9].  A plaintiff may create an issue of fact at the pretext stage by (1) presenting evidence that the defendant's proffered reason is not worthy of belief, thereby enabling the jury to infer that discrimination was the employer's real reason, or (2) presenting evidence that discrimination was, in fact, the employer's real reason.  *Wilson v. B/F Aero., Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004); *cf., e.g.*, *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997); *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988).  The district court must determine "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

---

[9] Overruled on other grounds by *Manders v. Lee*, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003).

legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks omitted).

Wright argues the ADOC's proffered reason for terminating his employment is pretext because (1) the ADOC's witnesses provided conflicting testimony about the events of November 12, 1993; (2) Wright did, in fact, acknowledge Findley's presence and therefore Wright should not have been terminated for violating policy; and (3) two of the white tower officers failed to timely acknowledge Findley.

These three arguments fail to cast sufficient doubt on the ADOC's assertion that it terminated Wright for being inattentive in failing to acknowledge Findley.

ADOC's witnesses, primarily Findley and Warden Nagle, did not provide contradictory reasons for Wright's termination. The record reveals that Findley consistently set forth in his written statements and testimony that Wright failed to timely acknowledge him on November 12, 1993. The record also indisputably reveals that Wright had a significant disciplinary history. These two facts remain uncontroverted and seemingly inconvertible. Wright points to inconsistences among the deposition testimony of the tower officers as to exactly when and how they acknowledged Findley. Yet, these inconsistencies come as no real surprise since these depositions were taken almost eighteen years after the 1993 event forming the basis of the lawsuit. Even giving Wright the benefit of the doubt and taking the facts

in the light most favorable to Wright, not one of these inconsistences casts a smidgen of doubt over the primary facts at hand; that is, Findley's steadfast statements that Wright was inattentive on November 12, 1993, that this was Wright's third citation for inattentiveness, and that Wright had seven prior infractions.

That Wright disagrees with Findley's version of events and the ADOC's decision to terminate based upon that version, standing alone, is insufficient to satisfy his burden to prove that the ADOC, in the persons of Nagle and Herring, did not in good faith believe that it had a legitimate basis for his termination. *See, e.g.*, *Chapman v. AI Transp*., 229 F.3d 1012, 1030 (11th Cir. 2000); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *Abel v. Dubberly*, 210 F.3d 1334, 1339, n.5 (11th Cir. 2000); *Alexander*, 207 F.3d at 1339, 1341; *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Whatever else can be said, the extant record fully supports their stated reasons.

While Wright may feel free to conjecture, this Court simply cannot second-guess an employer's non-discriminatory business decisions. *Flowers*, 803 F.3d at 1338. Even if the ADOC's (in particular, Nagle's) decision to terminate Wright for being inattentive on November 12, 1993 was mistaken, an employer "is not liable for discriminatory conduct" when it "fires an employee under the mistaken but honest impression that the employee violated a work rule." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d at 1363, n.3 (11th Cir. 1999). Here, with

27

discovery over and with the relevant records adduced, that impression appears fully merited, even if the result may strike Wright as unduly harsh.

In sum, Wright has failed to rebut the ADOC's legitimate reason for Wright's termination and therefore summary judgment is due the Defendants for this additional reason.

### B.    Wright's Race Discrimination Claims - "Convincing Mosaic"

Even though Wright has failed to establish a prima facie case of discrimination under the *McDonnell Douglas* framework, Wright's claims can proceed if he has otherwise presented "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination" or retaliation.  *Lewis*, 934 F. 3d at 1185 (considering plaintiff's claims following earlier *en banc* decision) (quoting *Lockheed-Martin Corp.*, 644 F. 3d at 1328).  Evidence showing such a mosaic may include "(1) 'suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees; and (3) that the employer's justification is pretextual." *Id.* at 1185.  "Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'" *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328)).

28

Also pertinent to this inquiry is the same principle already cited: that the Court is not authorized to second-guess the business judgment of an employer. *See Beckles v. Fed. Express Corp*., 489 F. App'x 380, 384 (11th Cir. 2012) (per curiam) ("We do not sit as a super-personnel department, and we do not review the wisdom of an employer's business decisions, no matter how mistaken, as long as the action was not for a prohibited discriminatory reason.") (citing *Alvarez v. Royal Atl. Developers, Inc*., 610 F.3d 1253, 1266-67 (11th Cir. 2010)).  "Unless something links the [challenged] actions to the employee's race, that a decisionmaker singles an employee out does not permit a jury to infer intentional discrimination based on race." *Burch v. Coca-Cola Bottling Co. United, Inc*., 51 F. Supp.3d 1176, 1194 (N.D. Ala. 2014) (quoting *Turner v. Fla. Prepaid Coll. Bd*., 522 F. App'x 829, 833 (11th Cir. 2013)).

Wright has not addressed in depth this alternative means of showing discrimination. But even if he did, for the same reasons that Wright has failed to show that the ADOC's reasons for his termination are pretextual, the Court further finds that he has failed to present a "convincing mosaic" sufficient to withstand summary judgment.  Indeed, even by Wright's own admission, Findley had to flash his headlights on several multiple occasions before Wright acknowledged him on November 12, 1993.  In the prison setting, especially in a maximum-security facility such as WJCF, inattentiveness in a perimeter tower is a significant infraction that

puts the general public at risk.  From this event, plus Wright's two other infractions for inattentiveness and sleeping on the job, in addition to other Rule 56 record evidence, the Court concludes that no reasonable jury could find that the Defendants' termination of Wright was motivated by any racial animus.

## C.    Retaliation Claims

Aside from discrimination, Wright also claims that his termination was in retaliation for his previous activities in filing an EEOC charge.  Based on the same evidence already parsed, the Court concludes the Defendants are entitled to summary judgment on Wright's retaliation claims too.

The anti-retaliation provision of Title VII is broader in scope than the discrimination provisions of Title VII. Indeed, a plaintiff may succeed on his retaliation claim even when his underlying discrimination claim fails. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63 (2006).  Still, absent direct evidence, courts also use the *McDonnell Douglas* burden-shifting framework to analyze retaliation claims.  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).  Under this framework, a plaintiff establishes a prima facie case of retaliation by showing (1) he engaged in a protected activity, such as reporting harassment or other discrimination based on a protected characteristic, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected

activity and the adverse employment action.  *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009).

Wright points to only one pre-termination protected activity: the filing of his EEOC charge on November 2, 1992.

To demonstrate a causal connection between this activity and any subsequent adverse employment actions, Wright must show that decisionmakers were aware of the activity and that the activity and the subsequent adverse employment actions were not "wholly unrelated."  *Shannon v. Bellsouth Telecomms., Inc*., 292 F.3d 712, 716 (11th Cir. 2002) (internal quotation omitted).  "Close temporal proximity" may sometimes, albeit rarely, be sufficient to show a protected activity and an adverse employment action were not "wholly unrelated."  *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). However, temporal proximity, without more, must be "very close." *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting Clark County School District v. Breeden, 532 U.S 268, 273 (2001)). By law, when three or more months elapse between a protected activity and an adverse employment action, the temporal proximity of the events is not "very close." *Thomas*, 506 F.3d at 1364.

Based on this jurisprudence, even though Wright's termination undoubtedly qualifies as an adverse employment action, that action came thirteen months after Wright filed his EEOC charge.  The temporal proximately simply does not rise to a

sufficient level to infer a causal connection under binding precedent. *Herron-Williams v. Ala. State Univ.*, Case No. 18-10875, 2020 WL 599301, at *9, 2020 U.S. App. LEXIS 3796 (11th Cir. Feb. 7, 2020) (*per curiam*) (where plaintiff employee filed EEOC charge in March, employer responded to EEOC in July, and employee's pay was reduced in September of the same year, not enough temporal proximity to establish causal connection for retaliation claim); *Thomas v. CVS/Pharmacy*, 336 F. App'x 913, 915 (11th Cir. 2009) (*per curiam*) (three-and-a-half months too remote to infer causation); *Wallace v. Ga. Dep't of Transp.*, 212 F. App'x 799, 802 (11th Cir. 2006) ("[W]e have observed that the Supreme Court has cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection."); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (involving alleged retaliation under the ADA).  Accordingly, the Court concludes the Complaint and record do not contain sufficient evidence supporting a causal connection between Wright's termination in December 1993 and the filing of his EEOC charge in November 1992.

To the extent Wright asserts his January 1993 reprimand constitutes actionable retaliatory conduct in response to his November 1992 EEOC claim, such an allegation is without merit.  An employment action that will support a retaliation claim is one that is "materially adverse."  *Crawford v. Carroll*, 529 F. 3d 961, 973 (11th Cir. 2008). A materially adverse action is one that "'well might have dissuaded

a reasonable worker from making or supporting a charge of discrimination,'"
"irrespective of whether it is employment or workplace-related."   *Id*. at 973-74
(quoting *Burlington*, 548 U.S. at 68).   As previously stressed, the "reprimand of an
employee does not constitute an adverse employment action when the employee
suffers no tangible harm as a result."   *Summerlin v. M&H Valve Co.*, 167 Fed. Appx.
93, 97 (11th Cir. 2006) (citing *Pennington v. City of Huntsville,* 261 F.3d 1262, 1267
(11th Cir. 2001)).   Wright does not allege that the written reprimand affected any
important condition of his employment, such as salary, benefits, title, or job duties.
Therefore, the written reprimand had no adverse effect on Wright's employment
even under the less strict retaliation analysis.   *See Akins*, 420 F.3d at 1301
(concluding that because plaintiff had not alleged that the reprimand and threats of
suspension affected the terms and conditions of employment, they did not constitute
adverse employment actions).   For the same reasons that the Court previously
concluded the reprimand did not rise to the level of an adverse employment action
for discrimination purposes, it also does not rise to the level necessary to support a
retaliation claim.

Nevertheless, even if Wright had established a prima facie case for retaliation,
his retaliation claim still suffers from the same flaw as his discrimination claims —
there is no substantial evidence rebutting the ADOC's explanation for Wright's

termination from which a reasonable jury could conclude that the ADOC's reasons were pretext for retaliation.

Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse action. *Crawford*, 482 F.3d at 1308. If the defendant proffers a legitimate non-retaliatory reason for its action, then the burden shifts back to the plaintiff to show that the reason is merely pretextual and that the real reason was retaliatory. *Id.* A plaintiff cannot merely point to facts that show retaliatory animus, and instead, must rebut each of the defendant's explanations. *Id.* The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided is pretext for retaliatory conduct. *Pennington*, 261 F.3d at 1266.

As already observed, the ADOC here argues that Wright's termination stems from the conduct occurring on November 12, 1993 and his previous disciplinary history. These are all legitimate non-retaliatory reasons for Wright's termination. Therefore, the burden shifts back to Wright to show that these are merely pretextual and that the real reason was retaliatory.

In response, Wright repeats the same reasons advanced in support of his discrimination claim as to why this Court should find the ADOC's proffered reason is pretext. (Doc. 44 at 20-21.) No constructive purpose would be served by reiterating the pretext analysis because it applies with equal force here. Simply put,

34

Wright has not shown that the ADOC's stated legitimate reasons for terminating his employment were a pretext for unlawful retaliation for the filing of his EEOC charge in 1992.[10]  As a result, the Defendants' motions are due to be granted on Wright's retaliation claim.

## V.    CONCLUSION

Based on the foregoing, the Defendants' Motions (Docs. 31, 36) are **GRANTED** and this case is dismissed with prejudice.

DONE, this 30th day of April, 2020.

_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE

---

[10] Wright raised these same issues during his administrative appeal process, and each time, his claims of discrimination and retaliation were rejected.

35